410

THE STATE OF MONTANA, ACTING BY AND THROUGH THE STATE HIGHWAY COMMISSION OF THE STATE OF MONTANA, PLAINTIFF AND APPELLANT, *v*. JOHN K. MILANOVICH AND ZORKA J. MILANOVICH, HUSBAND AND WIFE, DEFENDANTS AND RESPONDENTS.

No. 10538

Submitted June 3, 1963. Decided August 6, 1963.

Rehearing denied September 11, 1963.

384 P.2d 752.

Daniel J. Sullivan (argued orally), Harry C. Alley, Helena, for appellant.

Kendrick Smith (argued orally), J. E. Corette, III, Butte, for respondents.

MR. JUSTICE DOYLE delivered the Opinion of the Court

This is an appeal from a judgment entered in the district court of the second judicial district on a condemnation action. Commissioners initially awarded defendants, John K. and Zorka J. Milanovich, husband and wife, respondents here, $240 as the value of their property to be condemned and taken and $5,760 for value of damages their remaining property incurred because of the condemnation and subsequent taking. Plaintiff, appellant here, sought a jury trial to ascertain and determine the amount to be paid defendants. A jury verdict awarded the defendants $600 as the value of the condemned property to be taken and $10,000 as value of the damages incurred to the remaining property not taken. Plaintiff appeals.

Defendants own the west half of Block 44 of the Gallatin Addition, City of Butte, consisting of seven lots numbered 8 through 14 consecutively south to north. Defendants' property fronts on Oregon Avenue to the west and is bordered by "B" Street on the south.

The following plat depicts the property in question.

N

SIDEWALK

HOUSE LOT 14

STRU 13

HOUSE 12

GARAGE 11

10

9

8

SIDEWALK

OREGON AVENUE

SIDEWALK

CONDEMNED STRIP

PROPOSED CONCRETE RETAINING WALL

"B" STREET

SCALE: 1"=30'

Defendants had purchased lots 11, 12, 13 and 14 in 1945, lots 8 and 9 in 1946 and lot 10 in 1952. Defendants, in 1952, after acquiring these seven lots, constructed their present home in the middle of lot 12 with their garage located at the eastern end of lot 11. Defendants, in 1959, remodeled the house located on the eastern end of lot 14 and then rented out this house together with a structure situated on the eastern end of lot 13. At the commencement of this action, lots 8, 9 and 10 were vacant and unimproved, save sidewalks and curbs. Evidence was presented, without objection, to the effect that the defendants had obtained lots 8, 9 and 10 with the intention of constructing a multiple family unit thereon at some future date. There was evidence that in 1958 defendants had had plans drawn for the multiple family unit, and that the plans were drafted at a time prior to any thought of a highway acquisition in this area and were of sufficient completeness to lend credence to the plan or intent of defendants hereinafter discussed in more detail.

Plaintiff proposed to take a strip of land together with all access, light, air and view thereto and therefrom ten feet wide and ninety-six feet long on the extreme western end of lots 8, 9, and 10, running parallel to Oregon Avenue. This land was to be used in conjunction with the proposed construction of an overpass over a controlled access Interstate Highway located approximately two blocks south. The grade change of the overpass would commence on Oregon Avenue adjacent to lot 10 and increase in a southerly direction to a grade change of approximately three to three and one-half feet adjacent to the south end of lot 8. The grade of "B" Street would be raised accordingly to intersect the raised Oregon Avenue grade. Evidence indicated that work orders were issued from time to time during the course of construction for changes not anticipated in the original plans. In fact, work orders had been issued the day prior to the trial by the appellant's Butte office, but not approved at that time by the Helena office nor the Bureau of Public Roads. Some of the non-anticipated changes called for the construc-

tion of a concrete retaining wall extending approximately three-fourths the length of the remaining southern border of lot 8, and for the construction of a new drop inlet. The last two mentioned items would be located under the northern edge of "B" Street immediately south of lot 8 and were designed to remedy the anticipated situation which would occur in this area in time of rain or snow run-off.

R.C.M.1947, § 93-9912, subd. (2), specifies that if the property appropriated constitutes part of a larger parcel, the depreciation in value of the remainder of the parcel is to be determined. Appellant contends defendants' property is divided into three distinct and separate units or parcels, assumably, lots 8, 9, and 10, constituting the larger parcel to which section 93-9912, subd. (2), would allude. Defendants contend the contiguity of all the lots, the nature of their acquisition, improvements thereon and the nature of the planned improvements indicated that section 93-9912, subd. (2), would apply to all their property *in toto*. The principal issue on which this case must be decided therefore is whether or not a unity of use did exist between the lots which were partially taken and all or any parts of the other four lots in the one-half block owned by the defendants.

Damages for partial taking and decrease in value to the remainder to which section 93-9912, subd. (2), supra, alludes and the unity of use doctrine have been discussed previously by this court in State Highway Comm'n v. Heltborg, 140 Mont. 196, 369 P.2d 521, where, quoting from State v. Hoblitt, 87 Mont. 403, 408, 288 P. 181, 183, it was stated:

" 'Ordinarily damages may be awarded only for injury done to the particular lot or tract of land from which the right of way strip is taken and the above rule is applied in ascertaining the award to be made by a determination of the value of the acreage taken, and the depreciation in value of the remainder of the particular tract, regardless of what other lands the owner may possess (sec. 9944, Rev.Codes 1921, [now R.C.M.1947, §

416

93-9912]; Lewis and Clark County v. Nett, 81 Mont. 261, 263, P. 418), but, even where two tracts are separated by a highway or watercourse, or, as here, by railway, if they are used jointly by the owner in a single enterprise and the whole plant is depreciated in value by the proposed improvement the direct damages suffered may be compensated.' (See also State et al. v. Bradshaw Land & Livestock Co., 99 Mont. 95, 43 P.2d 674; Montana R. R. Co. v. Freeser, 29 Mont. 210, 74 P. 407.)"

Once unity of use is proven, it destroys separate parcels of land as created by law. However, this court does not apply the unity of use doctrine indiscriminately. The application of the unity of use doctrine is limited by the criteria this court established in State v. Bradshaw Land & Livestock Co., supra, that parcels of land used in the operation of a single enterprise, and therefore applicable to damages because of depreciation under the unity of use doctrine, will not be depreciated if the larger parcel is separated by too great a distance from the land condemned and taken.

Defendants' lots are not separated by distance nor by other tracts of land. Defendants' lots are contiguous, separated by a mere imaginary line, a line not located on the land itself, but a line created by law and reflected on a plat. Defendants' land situated as it is, is well within the criteria necessary for location in unity of use cases as established in the Bradshaw case, supra.

The critical question remains, is there a unity of use of these seven lots? In State v. Hoblitt, supra, this court stated the rule that if property is used jointly by the owner in a single enterprise and the whole plant is depreciated in value by the proposed condemnation improvement, the direct damages suffered may be compensated. Here, defendants introduced evidence which revealed that they were retired and that they had purchased the property in question with the specific intention of using it eventually as income producing property. There was evidence that the defendants had constructed their home

on lot 12 in such a manner as to enable them to look after and take care of their entire property. There was evidence that the intended use of the land by the defendants was not a dream concocted or contrived with the purposeful intent of obtaining a larger settlement from the appellant. Defendants' residence had been constructed in 1952 in an avowed manned designed specifically to enable them to observe and take care of their remaining property; plans had been obtained in 1958 for a multiple family dwelling unit to be constructed on lots 8, 9 and 10; and the house on lot 14 had been converted to income producing property as early as 1959. All of this work had been executed prior to the defendants having any knowledge of a highway acquisition of private land in this area. Both the commissioners and the jury found defendants' property to constitute a unit or an entity in itself from which a taking of part would damage the remainder and decided accordingly. Whether or not the property constitutes a unit was a question of fact, not of law. As such, this court can only conclude that the unity of use doctrine is applicable in this instant situation and, as found by the commissioners and jury, defendants' property was a single unit, not three distinct and separate units as appellant contends.

It should be understood that the application of the unity of use doctrine as set forth in the preceding paragraph applies only to the facts here present. This court feels that had the appellant initially taken appropriate steps, the unity of use doctrine as determined here would be limited to lots 8, 9, 10, 11, and 12. During the course of the trial, appellant's objections to the introduction of evidence concerning lots 11, 12, 13, and 14, were not well-taken in light of the complaint, exhibits attached thereto, summons and answer. Specifically, the complaint, attached exhibits, and summons did not define, qualify or limit the term "larger tract". In contrast, defendants' answer defined "larger tract" as consisting of lots 8, 9, 10, 11, 12, 13, and 14. Similarly appellant raised no objection to the court's

Instruction No. 4 initially defendants' Instruction No. 6, which read:

"If you find that all the lots 8 to 14, inclusive, were acquired to be used as a unit or were actually used as a unit, then you may allow damages, if any, to the remainder of all of said lots."

■ Appellant's Instruction No. 23, which the court refused to give, would not have remedied the existing situation. This court has previously stated in In re Estate of Murphy, 57 Mont. 273, 188 P. 146, the fundamental doctrine applied in all civil actions that:

"* * * In civil actions, the general rule is that the appellate court will only consider such questions as were raised in the lower court; the all-sufficient reason for the existence of the rule being that, had the question been raised in the lower court, the objection might easily have been remedied there. 2 R.C.L., § 52, pp. 69-71."

Defendants' witnesses, McCarthy, Olds and Harrington, similarly testified that they had been engaged in the business of appraising real estate for a considerable time; that they were acquainted with the general situation of the residential market value of property in the Butte area; that they were aware of the proposed condemnation and taking of the west ten feet of lots 8, 9, and 10, in Block 44 of the Gallatin Addition for highway construction purposes; that they were aware the complaint of appellant asserted not only the physical taking of this property, but also included the taking of all right of access, light, air and view, and that they were not entirely certain what the highway construction would ultimately consist of. By reason of appellant's objection to this testimony, appellant's fourth specification of error is represented by the question, "Can an appraiser testify to damages when he had no knowledge of the improvement to be constructed by the plaintiff?"

■ Appellant cites R.C.M.1947, § 93-9912, subd. (2), to

substantiate its argument and argues that "The witness must know that severance will occur and what is proposed to be constructed by the plaintiff." However, to fully determine damages caused by severance of condemned land, section 93-9912, subd. (2), is not read alone, rather it must be read in connection with section 93-9913, as amended, which reads:

"For the purpose of assessing compensation the right thereto shall be deemed to have accrued at the date of the service of the summons, and its actual value as of that date shall be the measure of compensation for all property to be actually taken, and the basis of depreciation in value of property not actually taken, but injuriously affected."

■ It is a well-established rule that the "actual value" spoken of in this section is the "market value" or "the price that would in all probability result from fair negotiation, where the seller is willing to sell and the buyer desires to buy." Northern Pac. & Mont. Ry. v. Forbis, 15 Mont. 452, 39 P. 571; State v. Lee, 103 Mont. 482, 485, 63 P.2d 135; State Highway Comm'n v. Peterson, 134 Mont. 52, 71, 328 P.2d 617, 627.

In discussing qualifications a witness must possess when testifying to the market value of property, this court held in State Highway Comm'n v. Peterson, supra, as follows:

"Who are competent to give opinions on value of property is generally in the discretion of the trial judge. It must appear that the witness has some peculiar means of forming an intelligent and correct judgment as to the value of the property in question beyond what is presumed to be possessed by men generally. Lewis, Eminent Domain, § 656, p. 1127 (3d ed.). One who knows the real property in question and is familiar with the uses to which it may be put, may testify as to its market value. The witness need not know of any sales and he need not be a technical expert. [Citing cases.]"

■ The present witnesses appear to be qualified by this statement. They, by their very business were familiar with various and sundry circumstances which might conceivably

enter into the depreciation of the market value of defendants' land. It is doubtful if the appellant could testify what improvements would ultimately be incorporated in the construction of the overpass. Changes occur as work progresses and are continually being made. The evidence illustrates this. Appellant's Butte office had issued an additional work order for the construction of a concrete retaining wall, and a new drop drain only the day before the trial. This order had not, as of then, been approved by the Helena office or the Bureau of Public Roads. What other changes would be required before the job was completed? To hold, as the appellant would have us, that the witnesses must be accountable for knowledge of the work yet to be accomplished, is contrary to the legislative intent as indicated by section 93-9913.

Appellant's remaining specification of error is contained in their question "Was the evidence sufficient to allow the jury to find in accordance with all the instructions that damage was incurred to all or any part of lots 11, 12, 13, and 14?"

█ The clearly erroneous specification of error has been adjudicated by this court as appears in State Highway Comm'n v. Peterson, 134 Mont. 52, 58, 328 P.2d 617, 620, as:

"* * * In eminent domain proceedings, the jury findings will generally not be disturbed on appeal unless they are so obviously and palpably out of proportion to the injury done as to be in excess of just compensation provided for by section 14, Article III, of the Montana Constitution. Yellowstone Park R. Co. v. Bridger Coal Co., 34 Mont. 545 [563], 87 P. 963; Interstate Power Co. v. Anaconda Copper Min. Co., 52 Mont. 509, 159 P. 408."

█ Defendant and his witnesses testified respectively to the value of the property taken and as to the depreciation caused to the property remaining as: Mrs. Milanovich—$600 and $19,500; Mr. McCarthy—$247 and $13,060; Mr. Olds—$240 and $15,150; and Mr. Harrington—$240 and $15,150. As previously indicated, the Commissioners assessed the property

taken as $240 and the depreciation to the remaining property as $4,760. The jury awarded a verdict of $600 for the property taken and $10,000 as the depreciation to the property remaining. Appellant's sole witness assessed a total just compensation of $1,300 for the value of the land taken and depreciation damages to the land remaining, which, in appellant's contention incorporated only lots 8, 9, and 10.

As discussed previously, defendants' entire property is applicable to assessment for depreciation damages under the unity of use doctrine. With the exception of the values testified to by the appellant's witness, the jury's verdict, as to the damages for depreciation resulting to the remaining property, is well within the testified values. Thus, this court does not now consider the evidence insufficient to justify the verdict arrived at by the jury.

Appellant partially answers specification of error number four by their own proposed theory when applied to their condemnation order. This court assumes appellant's three unit theory would divide defendants' property into three distinct and separate units or parcels consisting of lots 8, 9, and 10 in one unit, lots 11 and 12 in another unit and lots 13 and 14 in the last unit. It is uncontradicted that the physical taking of the strip would damage the unit consisting of lots 8, 9, and 10. But the condemnation of the taken strip of land does more than physically take the ground itself, the condemnation of this strip includes the taking of all access, light, air and view thereto and therefrom. The condemned strip borders on defendants' unit consisting of lots 11 and 12 by appellant's theory. When appellant takes this strip of condemned land, defendants are deprived of their right to access to and from lot 11. Defendants are also deprived of the air, light and view thereto and therefrom. Thus, by appellant's own volition there was evidence sufficient to allow the jury to find in accordance with all the instructions that damage was incurred not only to lots 8, 9 and

10, but also to lots 11 and 12. However unity of use governs the determination of this case and not appellant's theory.

The decision of the lower court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN C. HARRISON, CASTLES and ADAIR, concur.